IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, EASTERN DIVISION


CYTINA MILNER,                  )
                                )
        Plaintiff,              )
                                )      CIVIL ACTION NO.
        v.                      )      3:04cv919-MHT
                                )          (WO)
LEE COUNTY, ALABAMA,            )
et al.,                         )
                                )
        Defendants.             )


OPINION

In this lawsuit, plaintiff Cytina Milner asserts
several claims arising out her employment with the Lee
County, Alabama Sheriff's Department.  The defendants are
Sheriff Jay Jones in his official capacity, Lee County
and the Lee County Commission.  Milner alleges sex
discrimination and retaliation in violation of Title VII
of the Civil Rights Act of 1964 (Title VII), as amended,
42 U.S.C. §§ 1981a, 2000e through 2000e-17; sex
discrimination in violation of the Fourteenth Amendment
to the United States Constitution, as enforced by 42

Dockets.Justia.com

U.S.C. § 1983 (§ 1983); and disability discrimination and retaliation in violation of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12112-12117, 12203.   Milner's Title VII and ADA claims are against Sheriff Jones in his official capacity, and her § 1983 claim is against Lee County and the Lee County Commission.[1]

Jurisdiction is proper under 28 U.S.C. §§ 1331 (federal claims) and 1343 (civil rights) and 42 U.S.C. §§ 2000e-5(f)(3) (Title VII) and 12117 (ADA).   This case is currently before the court on the defendants' motions for summary judgment.   For the reasons detailed below, summary judgment is granted as to the ADA discrimination claim and the § 1983 claim.   Summary judgment is denied

_____

1. Milner has included the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981, as an alternative basis for her § 1983 claim.   Section 1981 was enacted to prevent discrimination based on race, not sex.   Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 960-961 (11th Cir. 1997).   Therefore, the court will analyze her § 1983 claim solely in relation to the Fourteenth Amendment.

as to the Title VII claims and the ADA retaliation claim.

## I. SUMMARY-JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Under Rule 56, the party seeking summary judgment must first inform the court of the basis for the motion, and the burden then shifts to the non-moving party to demonstrate why summary judgment would not be proper. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-17 (11th Cir. 1993) (discussing burden-shifting under Rule 56). The non-moving party must affirmatively set forth specific facts showing a genuine issue for trial and may not rest upon

the mere allegations or denials in the pleadings.  Fed. R. Civ. P. 56(e).

The court's role at the summary-judgment stage is not to weigh the evidence or to determine the truth of the matter, but rather to determine only whether a genuine issue exists for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).  In doing so, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).


## II. FACTUAL BACKGROUND

What follows is Milner's version of the facts:


### A. Sex Discrimination and Retaliation

<u>November 2000</u>: Milner began her employment as a corrections officer.  She was hired for a 12-hour shift

that rotated between day and nighttime hours.[2]   Her
duties included booking, photographing, fingerprinting,
and transporting inmates; security over inmates;
assisting with inmates' property; working with female
inmates regarding recreation or any other needed
assistance; working in other wings of the jail to assist
male officers; and filing.

Her immediate supervisor was Sergeant Rodney Tabb.
Sergeant Tabb sexually harassed Milner by talking to her
in a sexual manner, massaging her hands, rubbing her
back, running his finger down her back provocatively, and
touching the upper part of her buttocks.[3]

_____

    2. Plaintiff's Evidentiary Submission in Support of
Plaintiff's Response to Defendants' Motions for Summary
Judgment (hereinafter Plaintiff's Evidentiary Submission)
(Doc. No. 42), Deposition of Cytina Milner, Exhibit 1, p.
51.

    3. Id. at pp. 110-111.

<u>May 2001</u>:  At the suggestion of a sergeant other than
Tabb, Milner complained to Jail Administrator Etherline
Whitt about Tabb's conduct.[4]

<u>June 2002</u>: Because Milner had not received any
results from her complaint, she asked Jail Administrator
Whitt about its status.[5]

<u>June 30, 2003</u>: Milner wrote a letter to Sheriff
Jones, Chief Deputy Cary Torbert, and Jail Administrator
Whitt stating that the investigation into her complaint
was inadequate.[6]  Torbert denies receipt of the letter,
but acknowledged that Whitt had made him aware of it.

<u>August</u>:    Milner was told that the Sheriff's
Department found no evidence of sexual harassment by
Sergeant Tabb.

---

4. <u>Id</u>. at pp. 115-116.

5. <u>Id</u>. at p. 162.

6. <u>Id</u>., Letter to Jones, Torbert, and Whitt, Exhibit
14.

6

October: Chief Deputy Torbert placed Milner back on Sergeant Tabb's shift.[7]  Milner never had to work for Tabb, however, because she was terminated in November before the scheduled change went into effect.

October 23: Milner complained to Chief Deputy Torbert about his statement that female officers were to be limited in their work assignments to booking or to central control, both mainly secretarial assignments. Chief Deputy Torbert denied permanently limiting women to these two largely clerical positions but explained that women would be assigned there until they were able to get along. He further stated that until the women started to get along they had to answer to a corporal or sergeant.[8] Milner relayed the conversation to the other female officers in the room.

During her conversation with Chief Deputy Torbert, Milner either stated or implied to him that she thought

---

7. Id., Deposition of Cytina Milner, Exhibit 1, p. 230.

8. Id. at pp. 144-145.

7

he was lying.[9]  Torbert then cursed at Milner and yelled for her to go to central.[10]

### B. Disability Discrimination and Retaliation

<u>November 2001</u>:  During the Thanksgiving Holidays, Milner was rushed to the hospital with what she thought was a stroke.  Her medical reports showed that she had facial pain (the source of which was unclear) and headaches.  The report also concluded the Milner may suffer from some type of facial myalgia.[11]

At a follow-up appointment a few days later, she was diagnosed with right facial neuralgia.[12]  In lay terms, myalgia means "pain in a muscle or in several muscles," and neuralgia means "pain which originates in the

_____

9. <u>Id</u>. at p. 147.

10. <u>Id</u>.; <u>see also</u> <u>Id</u>., Daily Report Form, Exhibit 17.

11. <u>Id</u>., Emergency Department Report, dated 11/25/01, Ex. 18.

12. Id., Medical Report, dated 11/27/01, Ex. 19.

8

substance of a nerve and is felt in the area or part of the body which is covered or supplied by the nerve."[13]

November 2002 to February 2003: Milner took medical leave for approximately four months. She received donations of sick time from other employees, which allowed her to remain on paid leave. During this time, her pain was so severe that it inhibited her ability to speak, see, and move.[14]

February: When Milner returned to work in mid-February 2003, she worked four-to-five-hour daylight shifts for approximately one month based on her doctor's recommendation. She still experienced pain to the right side of her face; numbness in her tongue and throat; pain around her temporal lobes; and pain in the back of her head, which would radiate down her right side to her

_____

13. J.E. Schmidt, M.D., Attorney's Dictionary of Medicine, Volume 4, Cumulative Supplement December 2005, M-316, N-70 (Matthew Bender & Co., Inc., a member of the LexisNexis Group 2005)(1997).

14. Plaintiff's Evidentiary Submission (Doc. No. 42), Deposition of Cytina Milner, Exhibit 1, p. 81.

right hand.[15]  During this time, she often had "to sit to the side" and let her coworkers assist with her work.[16]

March 17: Milner's doctor allowed her to work eight-hour day-shifts; she no longer required much help from coworkers.[17]

August: Jail Administrator Whitt questioned Milner about her need to work during the day exclusively. Milner provided another doctor's note, dated August 27, stating that she can work only eight-hours daylight-shift days.[18]  Whitt responded that this note was insufficient because it gave no reason for the daylight restriction.

Milner's pain persisted, but it was not as severe as it was in the past.  The only limitation caused by her

_____

15. Id. at p. 186

16. Id. at p. 188.

17. Id. at p. 201.

18. Id., Doctor's notes, Exhibit 23.

continued pain was the eight-hour cap on her workdays;[19] her pain did not prevent her from performing any other daily functions.[20]

October 23: Milner obtaned an additional doctor's note explaining that, "in order to keep [Milner] stabilized and functional I have recommended her to continue to work eight hour work days, day shifts only."[21]

October 30: The Sheriff's Department received the October 23 doctor's excuse.

October and November: Milner's symptoms were the same as in August, that is, her pain limited her to eight-hour daylight shifts.[22]

––––––––––––––––––

19. Evidentiary Submissions in Support of Defendants' Motions for Summary Judgment (hereinafter Defendants' Evidentiary Submission) (Doc. No. 27), Deposition of Cytina Milner, Exhibit A, p. 216

20. Id. at pp. 217-219.

21. Plaintiff's Evidentiary Submissions (Doc. No. 42), Doctor's Notes, Exhibit 23.

22. Defendants' Evidentiary Submission (Doc. No. 27), Deposition of Cytina Milner, Exhibit A, pp. 217-219.

11

## C. Termination

October 31, 2003: Chief Deputy Torbert had a meeting with Milner in which he told her that he could no longer accommodate her work schedule.  He handed her a letter explaining that she was being terminated because she was unable to perform the required 12-hour shift.

Milner explained that she had an upcoming doctor's appointment in which she would be evaluated on whether she could return to a full 12-hour shift; she also pointed out that other officers were working eight-hour shifts.  She alternatively asked to be transferred to a clerical position.[23]

While Chief Deputy Torbert denied these requests, he suspended her, telling her not to return to work until she could work a full 12-hour shift.  As a result, Milner missed the weekend shift she was scheduled to work.[24]

_____

23. Plaintiff's Evidentiary Submission (Doc. No. 42), Deposition of Cytina Milner, Exhibit 1, p. 236.

24. Id. at p. 237.

12

**November 3**: Milner met with Chief Deputy Torbert and Brook Ballard, the Human Resources Coordinator for Lee County.  Torbert explained that Ballard was present to explain the Family and Medical Leave Act (FMLA).  He also told Milner she would have to work 12-hour shifts, take FMLA leave, or be terminated.

Milner declined the FLMA leave option because she would not be paid while she was out.  Human Resources Coordinator Ballard told Milner to think some more about the FLMA leave and to get back to her.

**November 5**: Milner again met with Chief Deputy Torbert and Human Resources Coordinator Ballard.  Milner was presented with a termination letter signed by both persons.[25]

**November 7**:  Milner appealed her termination.

**November 12**: Milner met with Sheriff Jones and Jail Administrator Whitt to discuss her termination,

---

25. *Id*., Termination Letter dated November 5, 2003, Ex.26.

13

after which Sheriff Jones upheld the decision to terminate her.[26]

Either at this meeting or shortly before it, Milner told Sheriff Jones that everyone got frantic when she complained about Sergeant Tabb's sexual harassment, that despite repeated inquiries she was given no information about the status of her complaint until August 2003, and that since her complaint Chief Deputy Torbert and Jail Administrator Whitt treated her differently and were trying to find reasons to terminate her.[27]

February 2004: Milner's application for state unemployment benefits was denied. She was found to have voluntarily left work without good cause because her injury was not considered work-related and because she refused FMLA leave.[28]

_____

26. Id., Memo regarding appeal of termination, dated November 12, 2003, Ex. 31; Memo to File regarding same dated November 17, 2003, Ex. 32.

27. Id., Deposition of Cytina Milner, Exhibit 1, pp. 254-5.

28. Id., Decision on Unemployment Compensation Claim, (continued...)

### III. DISCUSSION

#### A.  Title VII

#### 1. Discrimination

Under Title VII, it is illegal for an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e-2(a)(1).  Milner can prove a case of sex discrimination either through direct evidence of a discriminatory intent or by way of indirect or circumstantial evidence in the manner articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Wilson v. B/E Aero., Inc., 376 F.3d 1079, 1085 (11th Cir. 2004).  She proceeds under both theories.  The court will address each in turn.

_____

28.(...continued)
Ex. 41.

### a. Direct Evidence

The Eleventh Circuit definition of direct evidence has not been uniform.  For example, in <u>Caban-Wheeler v. Elsea</u>, 904 F.2d 1549, 1555 (1990), the Eleventh Circuit adopted a relatively broad definition of direct evidence, stating that "direct evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation of the employee."  That same year, in <u>Earley v. Champion Int'l Corp.</u>, 907 F.2d 1077, 1081 (11th Cir. 1990), direct evidence was defined more narrowly as "evidence which, if believed, would prove the existence of a fact in issue without inference or presumption." The Eleventh Circuit continues to apply both definitions. <u>Damon v. Fleming Supermarkets, Inc.</u>, 196 F.3d 1354, 1358 (11th Cir. 1999) (using the former); <u>Bass v. Bd. of County Comm'rs</u>, 256 F.3d 1095, 1105 (11th Cir. 2001) (employing later).

Nevertheless, the evidence in question here does not constitute direct evidence of sex discrimination under

16

either standard.  Chief Deputy Torbert informed Milner that the female corrections officers were to be in central or booking because they were not getting along and that until they reconciled they needed to answer to a corporal or sergeant.[29]  These statements are not direct

---

29. Milner also claims that Officer Wiltsie told her that Chief Deputy Torbert instructed him to relay that: female officers "can't do or have any say-so without [] com[ing] to a corporal or the sergeant or Major Torbert"; that they should permanently be in booking or central; that they cannot perform any tasks unless a male officer, sergeant or corporal was there; and that they were not even allowed to enter the female wing without a male officer.  Plaintiff's Evidentiary Submission (Doc. No. 42), Deposition of Cytina Milner, Exhibit 1, pp. 95, 96, 139-144.  These statements are inadmissable hearsay. Statements made by an employee with authority to speak for its employer on personnel matters generally or the employment decision at issue in particular may be admissible.  Zaben v. Air Prods. & Chems., 129 F.3d 1453, 1456 (11th Cir. 1997); see also Fed. R. Evid. 801(d)(2)(D).  Milner has the burden of establishing that Wilstie had the authority to make such statements on behalf on his employer.  Wilkinson v. Carnival Cruise Lines, Inc., 920 F.2d 1560, 1566 (11th Cir. 1991); Milner has not satisfied this burden.  Rather, both Chief Deputy Torbert and Wiltsie deny that Wiltsie was authorized to make the above statements.  Defendants' Evidentiary Submissions (Doc. No. 27), Declaration of Cary Torbert, Jr., Exhibit B, ¶¶ 6,7; Deposition of Cary Torbert, Jr., Exhibit C, p. 79; Declaration of William Wiltsie, Exhibit D, ¶¶ 3,4,5.

(continued...)

17

evidence because they do not necessarily "indicate that the complained-of employment decision was motivated by the decision-maker's sexism." Damon 196 F.3d at 1358. They could be interpreted to mean that the restrictions were put in place because of the women's interpersonal relationships instead of because of their sex. Where "differing inferences ... may be drawn from [a] statement[]," and one inference does not support discrimination, the statement does not constitute direct evidence of discrimination. Schoenfeld v. Babbitt, 168 F.3d 1257, 1267 (11th Cir. 1999).

## b. Indirect Evidence

To prevail on a sex-discrimination claim utilizing the McDonnell-Douglas test, Milner must first establish a prima-facie case of unlawful discrimination by a

---

29.(...continued)
In contrast, Chief Deputy Torbert's own statements to Milner are admissible because his managerial position afforded him the authority to make these kinds of personnel decisions.

preponderance of the evidence; this prima-facie case requires "'evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion.'" Herawi v. State of Alabama Dep't of Forensic Scis., 311 F.Supp.2d 1335, 1344 (M.D. Ala. 2004) (Thompson, J.) (quoting Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 358 (1977)).

If established, the prima-facie case raises a rebuttable presumption of illegal discrimination, and the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for his employment action. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981); Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc). "This intermediate burden is exceedingly light." Holifield v. Reno, 115 F. 3d 1555, 1564 (11th Cir. 1997).

Once the employer satisfies this burden of production, the employee must come forward with evidence that would be sufficient to convince a reasonable fact-finder that the reason given by the employer is

19

pretextual.  Combs v. Plantation Patterns, Meadowcraft, Inc., 106 F.3d 1519, 1528  (11th Cir. 1997).


### i. Prima-Facie Case

"To establish a prima facie case of disparate treatment Milner must show: (1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated male employees more favorably; and (4) she was qualified to do the job." E.E.O.C. v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286 (11th Cir. 2000).  Only the first element is undisputed.

As to the second element, there is no bright-line test for adverse-employment actions. Davis v. Town of Lake Park, 245 F.3d 1232, 1238 (11th Cir. 2001). Adverse- employment actions include ultimate employment decisions, such as the decision to hire or fire an employee, as well as conduct falling short of an ultimate employment decision that reaches "some threshold level of substantiality." Wideman v. Wal-Mart Stores, Inc., 141

F.3d 1453, 1456 (11th Cir. 1998).  The defining characteristic of an adverse-employment action is that it brings about a serious and material change in the terms, conditions, or privileges of employment as viewed by a reasonable person in the circumstances.  <u>Davis</u>, 245 F.3d at 1239.

Milner asserts the following adverse-employment actions:

<u>Work Assignments</u>: Milner's assignment to central booking after her confrontation with Chief Deputy Torbert is not an adverse-employment action. "[W]ork assignment claims strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets in response to shifting and competing market priorities." <u>Id</u>. at 1244. "In the vast majority of instances ... an employee alleging a loss of prestige on account of a change in work assignments, without any tangible harm, will be outside the protection afforded by Congress in Title VII's anti-discrimination clause." <u>Id</u>. at 1245.  This is

21

particularly true in circumstances like this one where "the work assignment at issue is only by definition temporary and does not affect the employee's permanent job title or classification." Id.[30]

Suspension: Her two-day unpaid suspension is an adverse employment decision. "[A]ctions that affect compensation are considered adverse employment actions." Gillis v. Georgia Dep't of Corrs., 400 F.3d 883, 887 (11th Cir. 2005)(noting that the plain language of the statute, 42 U.S.C. § 2000e-2(a)(1), makes it unlawful to discriminate against any individual with respect to his compensation, among other things).

Termination: It is undisputed that if Milner was terminated it would be an adverse-employment action. However, Sheriff Jones argues that she is collaterally

------

30. If Milner had evidence establishing that all, or a substantial number of, female corrections officers were actually limited to secretarial assignments, the court would find that these restrictions on the female officers' duties were adverse-employment actions. However, there is no evidence that these threatened limitations were ever put into effect.

22

estopped from arguing that she was terminated because, in a state unemployment compensation proceeding, she was found to have voluntarily left her employment. This argument is misguided because, for two reasons, administrative hearings have no preclusive effect on Title VII actions. <u>University of Tennessee v. Elliott</u>, 478 U.S. 788, 795 (1986). First, Title VII, specifically § 2000e-5(b), provides that the Equal Employment Opportunity Commission grant substantial weight to final findings and orders made by State or local authorities; it would make little sense for Congress to write such a provision if state agency findings were entitled to preclusive effect. <u>Id</u>. (internal quotation omitted). Second, Title VII claimants are entitled to de novo review in federal courts; it would contravene Congress's intent to supply administrative hearings with a preclusive effect. <u>Id</u>. at 796.

<u>Denial of Accommodation</u>: Milner asserts that Sheriff Jones's refusal to continue accommodating the eight-hour daylight shift recommended by her doctor is an adverse-

employment action. The court agrees. A reasonable factfinder could conclude that discontinuing such an accommodation would seriously and materially change the terms, conditions, or privileges of an employee's job.

As to the third element of a prima-facie case, Milner charges that Sheriff Jones treated certain full-time male corrections staff more favorably by not requiring them to work 12-hour shifts at the time she was told that this shift was mandatory. Sheriff Jones responds that all full-time corrections officers were treated the same in that each of them had to work 12-hour shifts beginning November 1, 2003. For the reasons detailed below, the court finds that there is evidence that, viewed in the light most favorable to Milner as the non-moving party, shows that not all full-time male corrections officers were required to work 12-hour shifts when she was denied her eight-hour accommodation, suspended, and terminated. This evidence is sufficient to support a finding that she was treated less favorably than male full-time corrections officers.

24

With respect to the fourth element, Sheriff Jones's sole objection to her qualification for her job was her inability to work 12-hour shifts. Again because, as will be discussed shortly, there is evidence that this 12-hour policy was not uniformly applied to all corrections officers, the court declines to find, as a matter of law, that 12-hour shifts were a necessary qualification for the job.

### ii. Employer's Nondiscriminatory Reason

Because Milner has established a prima facie case, the burden shifts to Sheriff Jones to articulate a legitimate, nondiscriminatory reason for not accommodating, suspending, and terminating her. Sheriff Jones has a burden of production, not persuasion, and does not have to persuade the court that it was actually motivated by the reason advanced. <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 258 (1981). He meets this burden by pointing to a labor shortage beginning in October 2003 brought about by both an increase in inmates

25

and a decrease in corrections staff. The jail experienced an influx of inmates at a time when one officer had been activated for military duty, two others were going to be deployed in the near future, another had resigned, one was scheduled to take maternity leave in early 2004, and the officers who had been amenable to primarily night-shift assignments wanted to return to rotating to the day shift.[31]

Faced with this staffing crisis, Chief Deputy Torbert instructed that all full-time corrections officers who had been allowed to work limited shifts would have to resume working rotating 12-hour shifts on November 1, 2003.

### iii. Pretext

Because the above reason eliminates the presumption of discrimination accompanying the prima-facie case,

---

31. Defendants' Supplemental Evidentiary Submission, Doc. No. 48, Declaration of Cary Torbert, Jr., Exhibit V, ¶¶ 3,4.

Milner must produce "evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable fact finder to conclude that the reason[] given by [the sheriff was] not the real reason[] for the adverse employment decision.'" Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc). She can establish that Sheriff Jones's proffered reason is not believable by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [his] proffered legitimate reason[] for ... action that a reasonable factfinder could find [it] unworthy of credence." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (internal quotations and citations omitted).

Milner argues that the labor-shortage rationale is pretextual because certain male employees were not required to work 12-hour shifts at the time she was not accommodated, suspended, and terminated for refusing to do so. In particular, Lieutenant Roberson and Officers Calloway, Sanders, Welch, and Wiltsie were not moved to

27

12-hour shifts until after her termination, which was several days after the date the 12-hour shifts were supposed to take effect.[32]

To be sure, Milner's comparisons to Officer Calloway and Lieutenant Roberson do not rebut Sheriff Jones's position that all full-time corrections officers resumed 12-hour shifts on November 1; Calloway was a part-time employee and Roberson was an administrator not an officer.[33]  However, there is a genuine issue of material fact as to whether Officers Sanders, Welch, and Wiltsie, full-time male corrections officers, were actually returned to 12-hour shifts on November 1.  The court is without the benefit of time records for these employees and Milner's testimony differs from Wilstie's and Chief Deputy Torbert's on this point.  Based on the evidence

_____

32. Plaintiff's Evidentiary Submission, Doc. No. 42, Deposition of Cytina Milner, Exhibit 1, pp. 86-87, 90-91.

33. Similarly, Milner also notes that Officer Cobb and Lieutenant Whitt did not work 12-hour shifts.  This evidence does not bolster her claim because both of these employees were females and neither were full-time corrections officers.

that some of the full-time male corrections officers did not work 12-hours and were not similarly treated when she was not accommodated, suspended and fired, a reasonable factfinder could conclude that the labor shortage was not the real reason for these actions.

Because Milner has "introduce[d] evidence sufficient to permit the factfinder to disbelieve [Sheriff Jones's] proffered explanations, summary judgment is not appropriate, because 'issues of fact and sufficiency of evidence are properly reserved for the jury.'" Combs, 106 F.3d at 1530 (quoting Hairston v. Gainesville Sun Publishing Co., 9 F.3d 913, 921 (11th Cir. 1993)).  Put another way, Milner survives summary judgement "by presenting evidence sufficient to demonstrate a genuine issue of material fact as to the truth or falsity of the [Sheriff Jones's] legitimate, nondiscriminatory reasons." Evans v. McClain of Georgia, Inc., 131 F.3d 957, 964-65 (11th Cir. 1997).

## 2. Retaliation

When, as here, circumstantial evidence is used to prove a case of Title VII retaliation, the claim is governed by the <u>McDonnell-Douglas</u> framework. <u>Berman v. Orkin Exterminating Co.</u>, 160 F.3d 697, 701-702 (11th Cir. 1998). Milner asserts that she experienced retaliation both for complaining about the restrictions on female officers, which the court will refer to as her retaliation-sex claim, and for complaining about being sexually harassed, which the court will call her retaliation-harassment claim.[34]

The sheriff has asserted the mixed-motive defense to these charges in his responsive summary-judgment pleadings. Milner contends that he waived this defense by failing to affirmatively plead it in his answer.

Generally if a party fails to raise an affirmative defense in the pleadings, that party waives its right to

---

34. Milner charges that she was retaliated against for complaining of sexual harassment. She does not bring a separate sexual harassment claim.

raise the issue at trial.   American National Bank v. Federal Deposit Insurance Corp., 710 F.2d 1528, 1537 (11th Cir. 1983).   However, it is not clear that the mixed-motive defense is an affirmative one. Pulliam v. Tallapoosa County Jail, 185 F.3d 1182, 1185 n.4 (11th Cir. 1999) (stating that this circuit has not addressed whether this defense falls within the range of Fed. R. Civ. P. 8(c)'s affirmative pleading requirements).   Even assuming that the mixed-motive defense is an affirmative one, the court can still conclude that the defense is properly before it because the Eleventh Circuit "avoid[s] hypertechnicality in pleading requirements and focus[es], instead, on enforcing the actual purpose of the rule." Hassan v. United States Postal Service, 842 F.2d 260, 263 (11th Cir. 1988).   "The purpose of Rule 8(c) is simply to guarantee that the opposing party has notice of any additional issue that may be raised at trial so that he or she is prepared to properly litigate it." Id.   Because Milner "has notice that an affirmative defense will be raised at trial, [Sheriff Jones's] failure to comply with

31

Rule 8(c) does not cause [Milner] any prejudice.  And, when the failure to raise an affirmative defense does not prejudice the plaintiff, it is not error for the trial court to hear evidence on the issue." Id. See also Pulliam, 185 F.3d at 1185 (finding that the defendant did not waive the mixed-motive defense by failing to include it in their answer because it was listed in the pretrial order).

When, as here, the mixed-motive defense is before the court, it must undertake a two-part test in analyzing a retaliation claim.  First, the court must determine whether Milner has proved by a preponderance of the evidence that an impermissible factor motivated Sheriff Jones's decision.  If Milner makes this showing, then liability is established and the court must proceed to the second step.  At step two, the court must decide whether Sheriff Jones has proved by a preponderance of the evidence that he would have taken the same adverse employment action even in the absence of the impermissible factor.  Price Waterhouse v. Hopkins, 490

U.S. 228, 252-53 (1989); <u>Pennington v. City of Huntsville</u>, 261 F.3d 1262, 1269 (11th Cir. 2001). If Sheriff Jones can establish that he would have made the same decision, he is absolved of liability and summary judgment should be granted. <u>Id</u>.

### a. Retaliation-Sex

To demonstrate a prima-facie case of retaliation Milner must show that: (1) she was engaged in statutorily protected activity under Title VII; (2) she suffered an adverse-employment action; and (3) there is a causal connection between the protected conduct and the adverse-employment action. <u>Parris v. Miami Herald Publ'g Co.</u>, 216 F.3d 1298, 1301 (11th Cir. 2000).

First, it is undisputed that Milner's telephone conversation with Chief Deputy Torbert, on October 23, 2003, in which she complained about female duty restrictions was a statutorily protected activity under Title VII.

Second, Milner proffers the same adverse-employment actions that she claimed in her Title VII discrimination charge.  For the reasons already provided, she has successfully established that her lack of accommodation, suspension, and termination constitute adverse-employment actions.

Third, to satisfy the causal connection requirement, Milner need only demonstrate "that the protected activity and the adverse action are not wholly unrelated." Simmons v. Camden County Bd. of Educ., 757 F.2d 1187, 1189 (11th Cir. 1985).  To show a relationship between the adverse action and the protected conduct, Milner must at least demonstrate that the decisionmaker was aware of the protected conduct when making the employment decision in question.  Brungart v. BellSouth Telecomm. Inc., 231 F.3d 791, 799 (11th Cir. 2000).  Once knowledge is established, temporal proximity between the adverse-employment action and the protected conduct is generally sufficient to raise an inference of causation.  Bechtel Constr. Co. v. Sec'y of Labor, 50 F.3d 926, 934 (11th

Cir. 1995); <u>see also</u> <u>Johnson v. Auburn University</u>, \_\_\_ F.Supp.2d \_\_\_, \_\_\_, 2005 WL 3088331 (M.D. Ala. 2005) (Thompson, J.) ("The shorter the period between the two events, the stronger the inference that the adverse action was improperly motivated; conversely, a long period of time between the protected conduct and adverse-employment action will negate an inference that the adverse action was caused by the protected expression.").

Milner was not accommodated and suspended eight days after her complaint and presented with a termination letter 13 days after this protected expression by the very supervisor to whom she complained. Her termination was upheld by Sheriff Jones on appeal seven days thereafter. The extremely short time span between her complaints and her lack of accommodation, suspension, and termination presents an acceptable inference that these actions were improperly motivated.

The evidence for the second and third prongs of the burden-shifting framework is the same articulated in the

35

Title VII discrimination case.  For the reasons detailed above, Sheriff Jones has met his burden of production, but Milner has presented sufficient evidence to support the conclusion that the proffered labor-crisis justification is pretextual.

Although Milner has established that her lack of accommodation, suspension, and termination were motivated by a prohibited factor, Sheriff Jones still can avoid liability by virtue of the mixed-motive defense if he has conclusive evidence "that [his] legitimate reason, standing alone, would have induced [him] to make the same decision." <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228, 252-53 (1989); <u>Pennington v. City of Huntsville</u>, 261 F.3d 1262, 1269 (11th Cir. 2001).  Sheriff Jones advances that the staffing shortage would have independently caused him to stop accommodating, suspend, and terminate Milner for refusing to work 12-hour shifts.  Because this court has already found that there is reason to doubt whether the 12-hour shift policy was uniformly implemented, the court also finds that Sheriff Jones has not shown that this

reason, standing alone, would have caused him to make the same employment decisions. Consequently, summary judgment is not due on this claim.


## B. Retaliation-Harassment

Milner engaged in protected activity when she complained of sexual harassment in May 2001; verbally inquired about her complaint in June 2002; wrote a letter on June 30, 2003, stating that the investigation into her complaint was inadequate; and explained to Sheriff Jones, about a week after the November 5 termination letter, that since her complaint Chief Deputy Torbert and Jail Administrator Whitt treated her differently and were trying to find reasons to terminate her.[35]

When drawing an inference of causation between statutorily protected conduct and adverse-employment

---

35. The defendant objects to this as inadmissible hearsay. The court disagrees because the statement is not being offered for the truth of the matter asserted. Rather it is offered to show that the sheriff had knowledge of Milner's complaint during the same week he upheld her termination.

action, the former must precede the latter. <u>Griffin v.
GTE Fla., Inc.</u>, 182 F.3d 1279, 1282 (11th Cir. 1999).
Milner was not accommodated and suspended in late October
2003 and terminated by Chief Deputy Torbert on November
5, 2003.  Her last complaint before these adverse-
employment actions was on June 30, 2003.  Sheriff Jones
argues that the four-month gap between her complaints and
these actions is too significant to infer that his
decisions had an impermissible motivation.  <u>Higdon v.
Jackson</u>, 393 F.3d 1211, 1220-1221 (11th Cir. 2004)
(finding that a three-month period is too substantial of
a delay to show causation in the absence of other
evidence tending to show the same).[36]

While Sheriff Jones is correct that Milner cannot
establish causation based on temporal proximity, Milner
has presented other evidence sufficient to show that

---

36. Milner also draws the court's attention to Chief
Deputy Torbert's decision to reassign her to Sergeant
Tabb's shift in October 2003.  This is not an adverse-
employment action because the shift change never in fact
occurred.

38

Sheriff Jones had a prohibited motivation. In particular, she has shown that she was not accommodated, and was instead suspended and terminated, for not working 12-hour shifts after complaining of sexual harassment; whereas other employees who did make such complaints were not disciplined for working shorter shifts during the relevant time period.[37]

As with her other retaliation claim, Sheriff Jones has not shown that his nonretaliatory reason--again the staffing crisis--standing alone, would have caused him to make the same employment decision. Summary judgment is denied.

---

37.  Milner points to other officers' statements that they overheard Jail Administrator Whitt and Chief Deputy Torbert discussing her sexual harassment claim and saying that "they just didn't want to hear anything about that" and that they were going to try to find a way to get her out the Sheriff's Department for stirring up a mess about Sergeant Tabb.  She also notes that Jail Administrator Whitt informed another officer that Milner was a "mess-maker".  These statements are inadmissible hearsay. Rojas v. Florida, 285 F.3d 1339, 1343 n.3 (11th Cir. 2002) (low-level supervisors or co-workers comments merely repeating management's discriminatory statements are inadmissible).

### B. ADA

### 1. Discrimination

In order to prove an ADA employment-discrimination claim, Milner must show that: (1) she has a disability; (2) she is a qualified individual, meaning that, with or without reasonable accommodations, she can perform the essential functions of the position in question; and (3) she was discriminated against because of her disability. <u>Lucas v. W.W. Grainger</u>, 257 F.3d 1249, 1255 (11th Cir. 2001).  A "disability" under the ADA is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).  Major-life activities may include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

Milner argues that her medical condition limits her major-life activities of seeing, speaking, and moving.

40

While the court agrees that an inability to see, talk, or move would qualify as a disability, Milner has not established that these symptoms, which occurred during the initial onset of her condition, were still present during the time period when the alleged discrimination took place.  Instead she stated that at the time she was denied accommodations, and was instead suspended and fired, there was no daily function that she could not perform and that her only limitation was, as set forth in her doctor's notes, a restriction to eight-hour daylight shifts.  Based on her own statements, the only major-life activity limited by her medical condition during the relevant time period was her ability to work.

However, to show that a physical impairment substantially limits the major-life activity of working, Milner must show that her condition prevented her from performing a large range of jobs, not just the particular job held.  <u>Sutton v. United Air Lines, Inc.</u>, 527 U.S. 471, 491 (1999); <u>see</u> <u>also</u> 29 C.F.R. § 1630.2(j)(3)(i) (explaining that an individual is substantially limited

in the area of working if the person is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.  The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.").  There is no evidence in the record about the effect of Milner's eight-hour daylight working cap on other jobs.  Consequently, her physical impairment is not a cognizable disability under the ADA.

Milner also argues that she was 'regarded' as having a disability because she could not work at night or a 12-hour shift.  To be "regarded as having such an impairment" means that an individual: (1) has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation; (2) has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others

42

toward such impairment; or (3) has none of the impairments [previously defined in this regulation] but is treated by a covered entity as having a substantially limiting impairment.  29 C.F.R. § 1630.2(l).

To prevail, Milner must show that Sheriff Jones mistakenly believed that her perceived impairment substantially limited a major-life activity.  D'Angelo v. Conagra Foods, Inc., 422 F.3d 1220, 1228 (11th Cir 2005); Hilburn v. Murata Elecs. N. Am., 181 F.3d 1220, 1230 (11th Cir. 1999).  She has provided no evidence that Sheriff Jones perceived her as limited in any way beyond her inability to work more than eight-hours days.  For the reasons already set forth, this is simply insufficient to demonstrate that Sheriff Jones regarded her as substantially limited in the major-life activity of working.

Accordingly, summary judgment is granted to Sheriff Jones on Milner's ADA discrimination claim.

### 2. Retaliation

The elements of a retaliation claim are the same under the ADA and Title VII.  Farley v. Nationwide Mutual Ins. Co., 197 F.3d 1322, 1336 (11th Cir. 1999).  As in the Title VII retaliation claim, the mixed-motive defense is operative here.

Beginning with the prima facie case, Milner's requests for accommodations undisputably meet the protected statutory activity element.  With respect to the adverse-employment-action prong, the court must reexamine Sheriff Jones's collateral-estoppel defense. Although University of Tennessee v. Elliott, 478 U.S. 788 (1986), is clear that unreviewed state administrative proceedings have no preclusive effect on Title VII claims, this holding does not mention ADA claims.  That being said, several circuits have applied Elliot to ADA claims because the ADA, specifically 42 U.S.C. § 12117, has incorporated the Title VII provision on which the Supreme Court relied in deciding Elliot.  See Pernice v. City of Chicago, 237 F.3d 783, 787 n.5 (7th Cir. 2001);

44

<u>Staats v. County of Sawyer</u>, 220 F.3d 511, 514 (7th Cir. 2000); <u>Thomas v. Contoocook Valley Sch. Dist.</u>, 150 F.3d 31, 39 & n.5 (1st Cir. 1998); <u>Kosakow v. New Rochelle Radiology</u>, 274 F.3d 706, 735 (2d Cir 2001).  <u>See</u> <u>also</u> <u>Medeiros v. City of San Jose</u>, No. 98-16530, 1999 U.S. App. LEXIS 18810, at *4 (9th Cir. Aug. 12, 1999)(unpublished).  The court is persuaded by this reasoning and finds that the unemployment-compensation agency's unreviewed findings are not afforded preclusive effect on Milner's ADA retaliation claim.

As to the third element, her last accommodation request was received by Chief Deputy Torbert on October 30, 2003, the day before her suspension and only a few days before her termination.  Further, Torbert's notes from the meeting in which she was terminated state that the meeting was called as a result of receiving her doctor's note.  Accordingly, she has established a prima-facie case of retaliation.

For the reasons already provided by the court, Milner has presented sufficient evidence to establish that the

labor-shortage reason profferd by Sheriff Jones is pretexual and that Sheriff Jones is incapable of proving, as a matter of law, that he would have made the same decision absent his retaliatory motive.

Therefore, summary judgment is not due on Milner's ADA retaliation claim.


### C. § 1983

Milner sues both Lee County and the Lee County Commission under § 1983.  A county may be sued under § 1983 only when the "execution of a government's policy or custom, whether made by its lawmakers or by those who edicts or acts may fairly be said to represent official policy, inflicts the injury." Monell v. Dept. of Social Servs., 436 U.S. 658, 694 (1978).  Milner argues that Lee County Human Resources Coordinator Ballard is an individual whose edits or acts represent official county policy because Ballard sat in on the termination meeting and signed her termination slip.  The court disagrees.

46

An individual's ability to serve as a final policymaker is governed by state law. McMillian v. Johnson, 88 F.3d 1573, 1578 (11th Cir. 1996). 1975 Ala. Code § 14-6-105 provides the sheriff with the power to appoint, direct, and control corrections officers. The Eleventh Circuit has already held that Alabama state law does not afford county officials any authority to fire county corrections officers. Terry v. Cook, 866 F.2d 373, 379 (11th Cir. 1989) (finding that Alabama county commissioners have no authority to hire or fire deputies or jailers); see also Turquitt v. Jefferson Cty, Alabama, 137 F.3d 1285, 1289 (11th Cir. 1998). Despite Milner's perception that Ballard had the authority to fire her, Ballard is not a final policymaker under Alabama state law, and therefore her actions cannot render the county liable under § 1983.

An appropriate judgment will be entered.

DONE, this the 16th day of May, 2006.

        /s/ Myron H. Thompson
        UNITED STATES DISTRICT JUDGE